Henry S. **FRETZ**, Petitioner,

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 1995.

Decided Oct. 6, 1995.

Joseph T. Nanovic for petitioner.

Patricia Krise Burket, Assistant Counsel, for respondent.

David B. MacGregor for intervenor Pennsylvania Power and Light Company.

Before McGINLEY and FRIEDMAN, JJ., and KELTON, Senior Judge.

FRIEDMAN, Judge.

Henry S. Fretz appeals from an order of the Pennsylvania Public Utility Commission (Commission) adopting the decision of an Administrative Law Judge (ALJ) which approved a letter of notification filed by Pennsylvania Power & Light Company (PP & L), denying Exceptions to the ALJ's decision filed by Fretz and granting Reply Exceptions filed by PP & L. We affirm.

On February 7, 1992, PP & L filed a letter of notification pursuant to 52 Pa.Code § 57.72 requesting Commission approval of PP & L's plan to replace existing 69 KV single circuit transmission lines connecting PP & L's Hosensack and Upper Hanover sub-stations with double circuit 138 KV lines with higher capacity conductors.[1] The pro-

---

1. 52 Pa.Code § 57.72(d)(1) states in pertinent part:

(1) A letter of notification may be filed with the Commission in lieu of the application process ... for the following:

ject consists of two sections, Section A and Section B. With respect to Section B, PP & L proposes to replace the existing 50–foot two-pole wooden "H-frame" towers with 85–foot single-shaft steel poles.

A portion of Section B runs through property owned by Fretz. With respect to that property, PP & L has a 50–foot strip right-of-way with 50–foot "no-build" restrictions on either side, for a total encumbrance of 150 feet.[2] There are currently six structures and 12 wooden poles on the Fretz property. PP & L's proposal is to replace them with only four structures and four steel poles, all within the existing right-of-way. PP & L proposes to configure the taller steel poles in such a way as to reduce the electro-magnetic field generated by the lines.

On March 6, 1992, Fretz filed a letter of protest which the Commission addressed at a public meeting on August 20, 1992. After some discussion, the Commission decided that the protest raised a question, i.e., whether PP & L's replacement of existing wood towers with taller steel poles would constitute a substantial alteration of the existing

> (i) An HV line which is proposed to be located entirely on an existing transmission line right-of-way, so long as the size, character, design or configuration of the proposed HV line does not substantially alter the right-of-way.
>
> ....
>
> (iv) A line for which the voltage is proposed to be increased above its present levels, so long as the size, character, design or configuration of the proposed HV line does not substantially alter the right-of-way.
>
> (v) An HV line which is to be reconductored or reconstructed so long as the size, character, design or configuration of the proposed HV line does not substantially alter the right-of-way.

2. The right-of-way agreement states in pertinent part:

> [We convey to PP & L] the right to construct, operate and maintain, and from time to time to reconstruct its electric lines, including such poles, towers, cables and wires above and under the surface of the ground, fixtures and apparatus as may be from time to time necessary for the convenient transaction of the business of [PP & L] ..., upon, across, over, under and along *a strip of land 50' [sic] feet in width* thru cleared land and 100' [sic] ft. in width thru woodland ... and upon, across, over, under and along the roads, streets and highways adjoining the said property ..., *including*

PP & L right-of-way. The Commission stated that the resolution of this issue would determine whether PP & L may proceed with certification of the project by letter of notification in lieu of formal application. The Commission referred this matter to an ALJ for hearings and a decision.[3]

After two hearings, upon consideration of the necessity, safety and impact of the project, the ALJ found, in addition to the facts as stated above, that (1) PP & L has a policy requiring a minimum 100–foot right-of-way to maintain safety code clearances with respect to electro-magnetic fields; (2) PP & L can physically place the towers on the 50–foot right-of-way over the Fretz property; and (3) the 50–foot "no-build" strips on each side of the 50–foot right-of-way provide enough of a restriction so that the new towers will fit safely on the overall right-of-way. The ALJ thus concluded that Section B of PP & L's project would not substantially alter the existing right-of-way and approved the project. Fretz filed Exceptions to the decision with the Commission, and PP & L filed Reply Exceptions.

> *the right of ingress and egress* to and from the said lines at all times for any of the purposes aforesaid ...; and in consideration of the said payments [we] do hereby release and quitclaim [PP & L] ... of and from any and all damages, loss or injury that may be at any time caused by or result from the construction, reconstruction, *operation and maintenance of the said* lines....
>
> And, further, in consideration of said payments, we do hereby covenant and agree ... that no house, barn or other structure, or inflammable or explosive materials of any kind, shall be built or stored on said property within a distance of *fifty (50) feet from either side of the said strip of land*, and that [PP & L] shall not be limited in its ... enjoyment of the rights hereby granted to such poles, towers, wires, cables, fixtures and apparatus as may be first constructed on said strip of land, but that *[PP & L] ... shall have, at all times in the future, the right to construct, operate and maintain, and from time to time to reconstruct additional poles, towers, wires, cables, fixtures and apparatus upon, across, over, under or along the said strip of land.*
> (R.R. at 1a.) (Emphasis added.)

3. Because Fretz's protest concerned only the erection of steel poles in Section B, all issues relating to Section A of the project were severed from the litigation.

The Commission adopted the decision of the ALJ and, in addition, found that the taller structures and reverse phasing proposed by PP & L would reduce the electromagnetic field at the edge of the 50–foot right-of-way over the Fretz property by more than seventy per cent. The Commission thus denied Fretz's Exceptions, granted PP & L's Reply Exceptions and approved PP & L's plan to reconstruct or modify Section B of the Hosensack–Upper Hanover transmission line.

 On appeal to this court,[4] Fretz first argues that the Commission and ALJ erred as a matter of law in considering the 50–foot "no-build" strips as part of PP & L's overall right-of-way and concluding, as a result, that PP & L could safely fit its project within the 50–foot right-of-way. We agree that the ALJ's decision seems to suggest that PP & L's right-of-way includes the 50–foot "no-build" strips; however, we believe that the Commission has adequately addressed this problem.

The ALJ found that PP & L could "physically place the towers on the 50–foot right-of-way which it holds over [Fretz's] land." (R.R. at 6a.) However, the ALJ, in considering whether PP & L could meet electromagnetic field safety requirements within the 50–foot right-of-way, stated:

[With respect to the question of need for a wider right-of-way to provide for safe operation,] I conclude that the 50–foot "no-build" strips on each side of the right-of-way do provide enough of a restriction so that the towers appropriately fit on the *overall right-of-way.*

(R.R. at 6a.) (Emphasis added.) We believe that the ALJ's use of the phrase "overall right-of-way" improperly suggests that the 50–foot "no-build" strips are part of the right-of-way.[5]

The Commission adopted the ALJ's decision but made an additional finding, i.e., that the taller structures and reverse phasing proposed by PP & L will reduce the electromagnetic field at the edge of the 50–foot right-of-way over Fretz's property by more than seventy per cent. Thus, the Commission determined that the 50–foot "no-build" strips were irrelevant to the issue of safety. We agree with the Commission. If PP & L can reduce the electro-magnetic field by seventy per cent within the 50–foot right-of-way, then that portion of the ALJ's decision implying that PP & L possesses a 150–foot right-of-way over Fretz's property is harmless error.[6]

 Fretz, however, contends that the record does not contain substantial evidence to support the Commission's finding that PP & L will reduce the electro-magnetic field by seventy per cent at the edge of the 50–foot right-of-way; indeed, Fretz maintains that the record shows that PP & L must have a 100–foot right-of-way to comply with the safety code. We disagree.

---

**4.** Our scope of review is limited to a determination of whether the Commission violated constitutional rights, committed an error of law or made necessary findings which are not supported by substantial evidence. *Bell Telephone Company v. Pennsylvania Public Utility Commission,* 83 Pa.Cmwlth. 331, 478 A.2d 921 (1984). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Norfolk & Western Railway v. Pennsylvania Public Utility Commission,* 489 Pa. 109, 413 A.2d 1037 (1980).

**5.** PP & L witness, James D. Barto, testified that he considered that there was a 150–foot encumbrance on the property. Barto acknowledged, however, that the right-of-way itself was different from the encumbrance on the property from the "no-build" restriction. (R.R. at 2a–5a.)

**6.** Fretz also alleges that PP & L has no right without the express permission of Fretz to walk on, drive on, build on, encroach on, put radiation or electro-magnetic fields on or do anything else on the 50–foot "no-build" strips. If PP & L did any of these things, according to Fretz, it would constitute trespass. We disagree.

First, the right-of-way agreement explicitly provides for the right of ingress and egress to the 50–foot right-of-way. (R.R. at 1a.) Thus, PP & L can walk on, drive on or encroach on the 50–foot "no-build" strips to reach the 50–foot right-of-way. Second, PP & L does not propose to build on the "no-build" strips as part of its reconstruction of the transmission lines. Finally, because PP & L will reduce the electro-magnetic field at the edge of the 50–foot right-of-way by seventy per cent, PP & L will put no more radiation or electro-magnetic energy on the 50–foot "no-build" strips than the amount presently allowed under the existing right-of-way agreement.

PP & L witness Gary P. Billman testified credibly as follows:

> [T]he addition of the second circuit, along with reverse phasing of the line, will substantially reduce electromagnetic fields emanating from the line. Specifically, at the edge of the 50–foot strip right-of-way, EMF will be reduced from 27.02 mG to 7.26 mG, a reduction of over 70%. Reverse phasing is an important part of PP & L's EMF Management Plan.

(R.R. at 16a.) We believe that such testimony constitutes substantial evidence to support the Commission's finding that PP & L will reduce the electro-magnetic field by seventy per cent at the edge of the 50–foot right-of-way.[7]

■ Fretz next argues that evidence in the record demonstrates that the safety code requires that PP & L have a 100–foot right-of-way in this case. Again, we disagree. PP & L submitted into evidence a document entitled "Field Management at Pennsylvania Power & Light Company," which states in pertinent part:

> *Transmission Engineering* will continue to use long-span "LONG" construction for 138 kV double circuit lines.... This construction requires a minimum 100' right-of-way to maintain safety code clearances. *Transmission Engineering* will evaluate existing narrower rights-of-way to determine if either a wider right-of-way should be obtained or if different construction should be used to optimize line design and magnetic field reduction.

(R.R. at 7a–8a.) (Emphasis in original.) While it is true that PP & L's policy is to require a 100–foot right-of-way for *new* long-span construction in order to maintain safety code clearances, PP & L's policy permits it to evaluate *existing narrower rights-of-way* to determine if a wider right-of-way should be obtained or if different construction should be used to optimize line design and magnetic field reduction. Here, PP & L evaluated its existing 50–foot right-of-way over Fretz's

property and determined that the use of reverse phasing will reduce the electro-magnetic field by seventy per cent at the edge of the 50–foot right-of-way. We believe that, having made such a determination, PP & L has complied with its policy.

Accordingly, we affirm.

### ORDER

AND NOW, this 6th day of October, 1995, the order of the Pennsylvania Public Utility Commission, dated September 14, 1994, is affirmed.

---

7. Fretz points to other figures in the record which, according to Fretz, contradict this testimony. However, these figures have been calculated for a 100–foot right-of-way where wires carrying thermal maximum current with 925 am-

pere *balanced phasing* have a 25–foot ground clearance. (*See* R.R. at 21a–22a.) Here, PP & L will use *reverse phasing* to reduce the electro-magnetic field at the edge of the 50–foot right-of-way.